[Cite as *State v. Lee*, 2018-Ohio-2252.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | CASE NO. 2017-L-148 |
| KY'SEAN C. LEE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2017 CR 000475.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Jenny Azouri* and *Teri R. Daniel,* Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Rick L. Ferrara,* 2077 East 4th Street, 2nd Floor, Cleveland, OH 44115 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Ky'Sean C. Lee, appeals his conviction in the Lake County Court of Common Pleas, following a jury trial in which he was found guilty of aggravated burglary, aggravated robbery, and related offenses. The lead issue is whether the trial court abused its discretion in denying defense counsel's request to continue the trial. For the reasons that follow, we affirm.

**{¶2}** On June 2, 2017, appellant was indicted, as pertinent here, for aggravated burglary, a felony-one, with a firearm specification; aggravated robbery, a felony-one, with a firearm specification; kidnapping, a felony-one, with a firearm specification; intimidation of a victim, a felony-three; and resisting arrest, a misdemeanor-two. Appellant pled not guilty.

**{¶3}** On June 26, 2017, the date set for trial, appellant's counsel made an oral request to continue the trial; however, appellant himself did not want a continuance and refused to waive his speedy trial rights, which were due to expire in a few weeks. Thus, the trial court denied the motion and the case proceeded to jury trial.

**{¶4}** Marshaun Ligon testified that on Saturday evening, April 15, 2017, he was at his home in Painesville with appellant. Appellant told him he had a "lick," meaning he knew of a house he wanted to burglarize. He said the house was nearby and it would be no problem because no one was home. Ligon was reluctant, but appellant was persistent, telling him they would be able to easily enter the house, steal what they wanted, and leave. Ligon agreed.

**{¶5}** On Sunday morning, at about 3:00 a.m., Ligon and appellant walked to the house appellant was talking about, which is on Jefferson Street. On the way, they saw a friend of appellant's who was walking the streets. That person walked with them to the house, but did not participate. Upon arrival, appellant and Ligon kicked the side door, but when they saw they were not going to be able to kick it open, appellant walked to the front door and pushed the door open by ramming it with his shoulder.

**{¶6}** Appellant went in and Ligon followed. Ligon searched downstairs in the living room and dining room, and appellant ran upstairs. Ligon was looking for drugs, money, and anything else of value he could find, but did not find anything. He then

2

decided to go upstairs and, as he walked up the stairs, he saw flashing police lights outside. While on the stairs, he heard appellant saying, "where's the money?" so he knew someone else was in the house.

{¶7} Ligon walked to a bedroom doorway and saw appellant laying on top of a girl on the bed holding a gun on her and asking her where was the money. Ligon said he recognized the gun because it used to be his and he gave it to appellant in a trade for another gun some months earlier.

{¶8} Nicole Boles testified that in the early morning hours of Easter Sunday, April 16, 2017, she was sleeping in her bedroom on the second floor of her home when she was awakened by a series of loud thuds. At the time she was alone because her sister, who was living at the house with her, was not home. She got up and walked to her sister's bedroom, which is next to hers. The window in her sister's bedroom was slightly open and she could hear men talking outside. She also saw a man standing outside near her house. She went to her room, called 911 on her cell phone, and told the dispatcher that someone was trying to break into her home.

{¶9} The dispatcher told Nicole to stay on the phone with him until the police arrived. While she was sitting on the bed talking to him, she saw a flashlight from a cell phone in the dark coming up the stairs to the second floor and told the dispatcher they were in the house.

{¶10} A male, who Ms. Boles later learned was appellant, came into her bedroom, rushed her onto the bed and got on top of her, putting a gun to the right side of her head. She said that, although it was dark, she knew the man had a gun because she could feel the cold steel against her head and she could "kind of see" the weapon in

3

her "peripheral" vision.  The man said, "where's the money" several times and she told him she did not have any money.

{¶11}  A second male, who Ms. Boles later learned was Marshaun Ligon, then came to the door and told appellant the police were there.  Appellant got off of Ms. Boles and he and Ligon ran downstairs. She said she had not hung up the phone and continued talking to the dispatcher.

{¶12}  Ligon testified that when they came downstairs, appellant fell over a coffee table in the living room and he helped him get up.  They went to the side door and saw police outside.  They then went to the back door and saw police everywhere.  At that time, appellant ran downstairs into the basement, still holding his gun.  About 20 seconds later, he came back up, but this time, he was no longer holding the gun.  Ligon identified in court the gun appellant had that night as the .357 magnum revolver he had traded with him.

{¶13}  Ligon told appellant there was no way out and they had to let the girl go.  Appellant said he had a plan.  He told Ligon "we're gonna tell her to not tell the police what we was doing."

{¶14}  Ms. Boles testified that appellant and Ligon came back upstairs.  Appellant sat next to her on the bed and Ligon was standing nearby.  Appellant told her she needed to go downstairs and tell the police that everything was okay so they (the police) would leave.  However, Ms. Boles said he had just held a gun to her head so why would she tell the police that everything was okay?

{¶15}  In order to leave the house, Ms. Boles finally agreed to do what appellant asked her.  She walked down the stairs and came to the front door.  The police told her

to come off the stairs and, as she did, they walked her to a nearby cruiser. Ms. Boles said that once she was with the officers, she told them everything that had happened.

{¶16} In a recording of the 911 call played for the jury, Ms. Boles can be heard telling the dispatcher that someone is trying to break into her home; Ms. Boles subsequently reported that they broke into the front door and are in the house. Later, she can be heard telling someone she does not have any money. After the men left her room, she can be heard telling the dispatcher they just ran down the stairs and the man was black and has a gun. Later, a man can be heard arguing with Ms. Boles.

{¶17} Ligon said the girl did not keep her promise because, after she left the bedroom and went outside, the police did not leave. He said the house was still surrounded by police and they would not be able to leave without getting shot so he and appellant decided to get some sleep. They returned to the girl's room, took off their shoes and some clothes, and laid down on the floor. Ligon identified a photograph of black Nike tennis shoes, which he said were appellant's.

{¶18} Ligon said that all through the night, he heard officers repeatedly yelling that they were the Painesville Police; that they should come out; and that no one would get hurt. However, Ligon said he thought if they went out they would get arrested or shot so they stayed in the house and fell asleep.

{¶19} Sergeant Mark Wagner of the Painesville Police Department said that he and several other officers responded to the scene. Sgt. Wagner had his officers set up a perimeter around the house and he went to the front door and started knocking. He announced that they were the police and that anyone inside should come to the front door. Shortly thereafter, Ms. Boles came to the door. She said there were two men in the house and one has a gun.

5

{¶20} Sgt. Wagner and other officers continued calling out into the house using a loudspeaker. When the suspects would not come out or acknowledge the officers' presence, he realized they had a "barricaded gunmen" situation so he had dispatch contact the SWAT team to ask them to respond.

{¶21} At around 5:00 a.m., Lieutenant Michael DeCaro, a SWAT officer with the Lake County Sheriff's Office, arrived with other members of his team. SWAT officers using the loudspeaker continued trying to communicate with the men inside, but no one responded.

{¶22} After waiting outside for some four hours for the suspects to come out, at about 9:00 a.m., the SWAT team entered the house through the side door and went into the basement. While searching for suspects, Lt. DeCaro found a .357 handgun on the floor. He unloaded it and found there were four live rounds and one spent round. He then gave the ammunition and the handgun to one of the deputies who was stationed at the side door for safekeeping while the team searched the rest of the house. The gun was later test-fired at the Lake County Crime Laboratory and found to be operable.

{¶23} Lt. DeCaro's team searched the first floor of the house, but did not find anyone. Before going upstairs, they announced themselves and told anyone upstairs to show themselves, but there was no reply. They opened the door of Ms. Boles' bedroom and found Ligon laying on the floor and appellant under the bed. Both males were handcuffed, walked out the front door, and turned over to Painesville Police officers.

{¶24} Ms. Boles testified that while she was sitting in the police cruiser, two other cruisers drove past her and she saw the two suspects who were in two separate cars. She told the police they were the two men who broke into her house that night.

6

{¶25} Detective Jason Hughes of the Painesville Police Department testified that at about 8:30 that morning, he was asked to meet with Ms. Boles to take a written statement from her. He then drove her to her residence and searched inside. He asked her if there was anything out of the ordinary. She showed him her coffee table and said the men had broken it. Inside her bedroom, she pointed out a pair of Jordan tennis shoes and a pair of Nike shoes on the floor, which she said were not there before the break-in and she did not know how they got there.

{¶26} Det. Hughes then searched the exterior of the residence. He said that on the south side of the house, they located three shoe prints on the door itself, one containing the word "Jordan," which were apparently made when someone was trying to kick the door open. He photographed the prints, made impressions of them, and lifted them with tape. The two pairs of tennis shoes found in the house and the shoe print impressions were turned over to the Crime Lab for identification. The Nike shoes contained appellant's DNA and the Jordans contained Ligon's DNA. The lab also found the shoe prints taken from the side door matched both pairs of shoes.

{¶27} After making arrangements with Ms. Boles' sister, who was not home at the time, Det. Hughes searched her room and found a .9mm gun in her dresser drawer and, although he took it in evidence, it was found to be unrelated to the break-in.

{¶28} Appellant did not testify or present any witnesses to testify on his behalf. Thus, none of the state's evidence was disputed.

{¶29} The jury found appellant guilty of aggravated burglary, a felony-one, with a firearm specification; aggravated robbery, a felony-one, with a firearm specification; kidnapping, a felony-two (based on the jury finding that appellant released the victim in

a safe place unharmed), with a firearm specification; intimidation, a felony-three; and resisting arrest, a misdemeanor-two.

{¶30} At sentencing, the court considered that appellant committed these offenses while on bond on a felony case in Ashtabula County. The court also considered appellant's extensive criminal record, although he was just 22 years old. He was found delinquent seven times for a broad range of crimes, including unlawful restraint, assault, theft, receiving stolen property, burglary, possession of dangerous drugs, and 13 probation violations. As an adult, he was convicted five times for several crimes, including attempted improper handling of a firearm in a motor vehicle, possession of heroin and aggravated possession of drugs, falsification, and fleeing and eluding, for which he was sentenced to prison.

{¶31} Appellant asked the court to merge all firearm specifications as well as aggravated burglary and aggravated robbery. The court merged kidnapping and aggravated robbery, but did not merge the burglary and robbery offenses or their firearm specifications. The court sentenced appellant to three years in prison for aggravated burglary, three years for aggravated robbery, one year for intimidation, and 90 days for resisting arrest. The court ordered the sentences for aggravated burglary, aggravated robbery, and intimidation to be served consecutively to each other and the sentence for resisting arrest to be served concurrently to the others. The court also sentenced appellant to three years each for the firearm specifications to aggravated burglary and aggravated robbery, which sentences were to be served consecutively to the other sentences, for a total of 13 years.

{¶32} Appellant appeals his conviction, asserting four assignments of error. For his first, he alleges:

8

{¶33} "The trial court erred in failing to grant the defense a continuance after the state revealed, four days prior to trial, that the co-defendant would offer testimony against appellant in exchange for a plea deal."

{¶34} This court, in *State v. Moore*, 11th Dist. Geauga No. 2014-G-3195, 2014-Ohio-5183, stated:

> {¶35} The Ohio Supreme Court has held "[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An abuse of discretion connotes the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting Black's Law Dictionary 11 (8th Ed.2004). In considering whether a trial court abused its discretion when ruling on a motion for continuance, a reviewing court must weigh any potential prejudice to the defendant against the trial court's "right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Unger, supra,* at 67. *Moore, supra*, at ¶54.

{¶36} Here, on the morning of trial, Monday, June 26, 2017, appellant's counsel orally moved for a continuance because, four days earlier, on Thursday, the prosecutor told him that Ligon had entered a cooperation agreement and would be testifying at trial and the state gave the defense a copy of Ligon's statement. Counsel told the court he needed additional time to "counter-research Ligon" and to rebut Ligon's allegation that appellant was the principal offender. The trial court denied the continuance for the reasons discussed during the following exchange between the court and defense counsel:

> {¶37} JUDGE LUCCI:  Alright. The Court denied an oral motion by Defense counsel for a continuance of the jury trial in favor of the Defendant's speedy trial rights, which were not waived.  Speedy trial would run in a couple of weeks, two or three weeks.  I'm not sure the exact date. This was the only date that I had available to put this.  What further complicated it [is] there's a co-defendant and

9

I had to set the co-defendant's case on a different jury than this one. Marshaun Ligon was also set for a jury trial, and they could not be the same jury. And by law they go in 3 week segments. Therefore they're gonna necessarily be separated anywhere by one to three weeks. And so the luck of the draw, this case was set here. Marshaun Ligon's was set with another jury, and therefore this is the only date that I had available for it. And the request this morning for continuance was denied. * * *

{¶38} * * *

{¶39} JUDGE LUCCI: And so since * * * time was not waived, speedy trial controls everything. And waiver of speedy trial is between the Defendant and his attorney * * *. But as a further ground, the Defense who had been provided information and discovery on a timely basis, stated that the final disclosures were made on Friday. That disclosure was a cooperation agreement with the co-defendant. And that couldn't have been accomplished any earlier than what it was. And therefore, the Court, having considered all of that, denied that. * * *

{¶40} * * *

{¶41} JUDGE LUCCI: [D]o you have anything else to put on other than what we've put on the record?

{¶42} ROBERT FARINACCI [DEFENSE COUNSEL]: [O]n Friday with notice late Thursday we find out that Mr. Ligon is gonna testify. And certainly when a co-defendant is gonna take the stand in the trial of his other co-defendant and give testimony against that co-defendant, the defenses that are developed are likely to be significantly impacted, and in these circumstances they were significantly impacted. So, to go to trial this quick with this much evidence coming in, even as recently as Friday, prejudices my client for a fair trial.

{¶43} JUDGE LUCCI: Well and you talked to your client in preparation for today, correct?

{¶44} [DEFENSE COUNSEL]: I have, Your Honor.

{¶45} JUDGE LUCCI: Alright. And you told him all that, right?

{¶46} [DEFENSE COUNSEL]: I have, Your Honor.

{¶47} JUDGE LUCCI: And nonetheless, *he has not waived speedy trial.*

10

{¶48} [DEFENSE COUNSEL]: *He has not*, Your Honor.

{¶49} JUDGE LUCCI: His speedy trial rights are paramount. *And so long as he knows that you're telling him hey, you're making me prepare on such short notice.* I am not making you prepare on short notice. The State of Ohio is not making you prepare on short notice. *It's your [client] making you prepare on short notice, and that speedy trial matter is between you and your client. You know, you give me a hundred and fifty-day waiver, * * * then I'd give you more time.* (Emphasis added.)

{¶50} Later in the trial when appellant asked the court to discharge his attorney as being ineffective, the trial court further explained the context in which defense counsel made his request for a continuance, as follows:

{¶51} And Mr. Farinacci has been performing competently. In fact, he has been performing in an amazing manner considering that the case was only indicted this month. * * * Less than 3 weeks ago. And *it was Mr. Lee that forced Mr. Farinacci to go to trial here. Mr. Farinacci wanted a continuance. But Mr. Lee would not allow him to ask for a continuance,* and *stated he wanted his speedy trial rights enforced.* So when it comes to - - and I asked him on the record did Mr. Farinacci tell you that he needed more time, and that I would give him more time. And all of that was talked about in court, and nonetheless, *Mr. Lee wanted this case to go to trial now.* And he got his trial now because I would have to discharge him in a couple of weeks for a violation of his speedy trial rights. So he walked into this with his eyes open. Now after the State presented all 9 of its witnesses, can't say well alright. I don't like the way the witness' testimony came out and therefore I'm gonna try to obstruct things by * * * saying that I'm going to fire my attorney. (Emphasis added.)

{¶52} Then, in addressing appellant, the trial court stated:

{¶53} You know, you could have waived time. I believe I mentioned give me a hundred and fifty day waiver. That doesn't mean your trial will take place in a hundred and fifty days, but you see that I'd have to let you go in a couple of weeks. * * * And * * * you forced the case * * * to go to trial. * * *

{¶54} On appeal, appellant does not dispute the trial court's findings that he refused to agree to a continuance; that he refused to waive his speedy trial rights; and

that he wanted to proceed to trial at that time.   Further, the trial court said he would have granted a continuance but for appellant's desire to go to trial that morning.

{¶55} "Under the invited-error doctrine, '[a] party will not be permitted to take advantage of an error which he himself invited or induced.'" *State v. Bey*, 85 Ohio St.3d 487, 492-493 (1999), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus.  While appellant is correct in arguing on appeal that a motion for continuance ordinarily tolls the speedy trial statute, in the circumstances presented here, any error resulting from the trial court's denial of the continuance was induced or invited by appellant's actions.   But for his insistence on going to trial on the scheduled trial date and his refusal to agree to the continuance or to sign a speedy trial waiver, there would have been no potential error.  Accordingly, under the invited-error doctrine, he cannot now take advantage of an error he invited or induced.

{¶56} In any event, although defense counsel argued below that appellant would be prejudiced if the continuance was denied, counsel did not provide any specifics as to how he would be prejudiced.  Further, any error was harmless because the evidence of appellant's guilt was overwhelming.  It was undisputed at trial that appellant tried to kick in the side door; pushed in the front door with his shoulder; stormed into Ms. Boles' bedroom; pushed her on her bed; got on top of her; and, while putting a gun to her head, demanded money from her. Ms. Boles and Ligon corroborated each other's testimony.   Thereafter, appellant was found by police hiding under the victim's bed. Moreover, the scientific evidence showed the shoe prints taken from the exterior of the side door matched the shoes worn by appellant and Ligon that night.

12

**{¶57}** We therefore hold the trial court did not abuse its discretion in denying counsel's request for a continuance.

**{¶58}** For his second assigned error, appellant contends:

**{¶59}** "The state presented insufficient evidence of a three-year firearm specification for aggravated burglary."

**{¶60}** An appellate court reviewing the sufficiency of the evidence examines the evidence admitted at trial and determines whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). Whether the evidence is legally sufficient to sustain a verdict is a question of law, which we review de novo. *Id.* at 386.

**{¶61}** Appellant argues that the burglary ended upon entry into the home and that to be convicted of the firearm specification to aggravated burglary, the state was required to prove he used the gun to enter the home. He argues that since the state did not prove this, the evidence was insufficient to support his conviction of the specification.

**{¶62}** However, the Supreme Court of Ohio rejected this argument in *State v. Powell*, 59 Ohio St.3d 62 (1991), in which the Court held: "The crime of aggravated burglary continues so long as the defendant remains in the structure being burglarized because the trespass of the defendant has not been completed." *Id.* at paragraph one of the syllabus. This court followed *Powell* in *State v. Arnold*, 11th Dist. Geauga No. 91-

13

G-1671, 1993 WL 262589, *3 (Jun. 30, 1993). *Accord State v. Pullens*, 12th Dist. Clermont No. CA2015-03-024, 2016-Ohio-260, ¶14, citing *Powell* (where defendant in possession of gun entered home by stealth and, after initial entry, hit victim with his gun and then held victim at gunpoint while co-defendant looked for items to steal, either circumstance was sufficient to support firearm specification). Significantly, appellant does not try to distinguish or even mention *Powell.*

{¶63} Thus, it makes no difference that appellant did not use his gun to enter Ms. Boles' home. While he was in the house, he used the gun that was in his possession by holding it to the victim's head while demanding money from her. Thus, the state presented sufficient evidence to support his conviction of the firearm specification to aggravated burglary.

{¶64} For his third assignment of error, appellant alleges:

{¶65} "The trial court erred in failing to merge the principal offenses of aggravated robbery and aggravated burglary."

{¶66} R.C. 2941.25 reflects the General Assembly's intent to prohibit or allow multiple punishments for two or more offenses resulting from the same conduct. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶11. R.C. 2941.25 provides:

{¶67}   (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment * * * may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶68}   (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment * * * may contain counts for all such offenses, and the defendant may be convicted of all of them.

14

{¶69} The Ohio Supreme Court, in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, held that "[u]nder R.C. 2941.25, the [trial] court must determine prior to sentencing whether the offenses were committed by the same conduct." *Johnson* at ¶47.

{¶70} In *Johnson, supra*, the Court held that when determining whether multiple offenses are allied offenses of similar import under R.C. 2941.25, "the conduct of the accused must be considered." *Johnson* at syllabus. Further, in making such determination, "the question is whether it is possible to commit one offense and commit the other with the same conduct * * *." *Id.* at ¶48. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶49. "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Id.* at ¶50.

{¶71} More recently, in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, the Ohio Supreme Court reaffirmed its holding in *Johnson* that in determining the existence of allied offenses, the emphasis is on the defendant's conduct, rather than an abstract comparison of the elements of the subject offenses. *Ruff* at ¶16, 26. However, the Court in *Ruff* stated that the *Johnson* test is "incomplete because R.C. 2941.25(B) provides that when a defendant's conduct constitutes two or more offenses of dissimilar import, the defendant may be convicted of all of the offenses." *Ruff* at ¶16. The Court in *Ruff* held: "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors -- the conduct, the animus, and the import." *Ruff* at paragraph one of the syllabus. Further, "[t]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B)

15

* * * if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus. The Court in *Ruff* explained:

> **{¶72}** A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance -- in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, [or] (3) the offenses were committed with a separate animus or motivation. *Ruff*, *supra*, at ¶25.

**{¶73}** Thus, *Ruff* reaffirmed the two elements in the merger analysis in *Johnson* (whether the offenses were committed separately and whether they were committed with a separate animus) and added a third element (whether the offenses were of similar import).

**{¶74}** We review the trial court's merger ruling de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶28.

**{¶75}** Here, the indictment charged appellant with aggravated burglary, in violation of R.C. 2911.11(A)(2), in that, by force, he trespassed in an occupied structure when another person is present with purpose to commit therein a criminal offense and he had a firearm on or about his person.

**{¶76}** The indictment also charged appellant with aggravated robbery, in violation of R.C. 2911.01(A)(1), in that, while attempting or committing a theft offense, he had a firearm on or about his person and brandished or used it. Appellant was found guilty of both offenses as charged.

**{¶77}** While aggravated burglary and aggravated robbery can be allied offenses of similar import under *Johnson* and *Ruff*, we must consider these offenses in the

16

context of appellant's conduct to determine (1) if the offenses were dissimilar in import or significance; (2) if the offenses were committed separately; or (3) if the offenses were committed with a separate animus or motivation. If any of these three factors is true, the offenses are not subject to merger pursuant to R.C. 2941.25. *Ruff* at ¶25.

{¶78} Ohio courts, including this court, applying *Johnson*, "have repeatedly held that aggravated burglary does not merge with aggravated robbery where they were committed separately and/or with a separate animus." *State v. Armstead-Williams*, 11th Dist. Portage No. 2016-P-0007, 2017-Ohio-5643, ¶30.

{¶79} The facts in *Armstead-Williams* are, analytically, quite similar to those at issue here. In *Armstead-Williams*, Tyler, one of the victims, opened his door to two gunmen who forced their way into his apartment. The victims inside were robbed of money and pistol-whipped. In holding that the resulting aggravated burglary and aggravated robbery did not merge, this court, at ¶35, stated:

> {¶80} In reviewing appellant's conduct in light of the elements of the charged offenses and *Ruff*, aggravated burglary and aggravated robbery did not merge because they were committed separately and were of dissimilar import. Under R.C. 2911.11(A)(1), the aggravated burglary was completed when appellant trespassed into Tyler's apartment by force with purpose to commit theft (by demanding money) and threatened to harm him. Further, under R.C. 2911.01(A), the aggravated robbery was completed when, in committing the theft, appellant inflicted serious physical harm on Tyler by beating him in the head with his gun. Since the aggravated burglary was complete when appellant threatened to harm Tyler, appellant's subsequent act of pistol-whipping him was unnecessary to complete aggravated burglary. Thus, aggravated robbery was committed separately. Moreover, aggravated robbery was of dissimilar import in that it caused separate, identifiable harm to Tyler. If a separate penalty could not be imposed for the aggravated robbery, that would mean that appellant would be free to inflict physical harm on Tyler without additional penalty.

17

{¶81} Here, the aggravated burglary and aggravated robbery were committed separately. Pursuant to R.C. 2911.11(A)(2), the aggravated burglary was completed for merger purposes when appellant forced his way into Ms. Boles' front door when she was present while he had a gun and the intent to commit a theft. Further, pursuant to R.C. 2911.01(A)(1), the aggravated robbery was completed when appellant put a gun to her head while demanding money from her. The *use* of the gun was not necessary to complete aggravated burglary.

{¶82} In addition, aggravated robbery was of dissimilar import because it caused separate, identifiable harm to Ms. Boles. The harm caused by appellant in committing aggravated robbery was the psychological harm the victim suffered as a result of appellant putting a gun to her head. She testified he thus basically threatened her life. As this court stated in *Armstead-Williams*, if a separate penalty could not be imposed for the aggravated robbery, that would mean that appellant was free to inflict this additional harm on Ms. Boles without additional penalty.

{¶83} Significantly, appellant does even mention *Ruff* or *Armstead-Williams.*

{¶84} We therefore hold the trial court did not err in not merging aggravated burglary and aggravated robbery.

{¶85} For his fourth and last assigned error, appellant contends:

{¶86} "The manifest weight of the evidence did not establish that appellant brandished a gun during the burglary."

{¶87} In determining whether the judgment is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *Thompkins*, *supra*, at 387. The court determines whether, in resolving conflicts in the evidence and deciding

witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Witness credibility rests solely with the finder of fact, and an appellate court is not permitted to substitute its judgment for that of the jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986).

{¶88} Appellant argues his conviction for the two gun specifications was not supported by the weight of the evidence because Ligon could not say where he kept the other gun (which he received in the trade). However, appellant does not support this argument by reference to the record. In any event, even if Ligon could not remember this detail, the jury was not required to discount his testimony that appellant used a gun to demand money from Ms. Boles, especially since she corroborated that testimony. Further, Lt. DeCaro's testimony that he found a .357 revolver in the basement corroborated Ligon's testimony that when appellant went in the basement, he was holding his .357, but that when he came back upstairs, he did not have it.

{¶89} Next, appellant argues that Ms. Boles' testimony regarding his possession of a gun was not trustworthy because she did not actually see it. However, she testified she felt the coldness of the steel of the gun against her head while appellant was demanding money from her. She also stated she could "kind of" see the gun in her "peripheral" vision. She said the gun was "dark" in color with "a silverish tint." Further, Ligon corroborated Ms. Boles' testimony about appellant having a gun because he said that when he first came to her doorway, he saw appellant on top of her holding a gun, which he recognized as the gun he had previously exchanged with appellant in a trade. In addition, when the men ran down the stairs, Ms. Boles told the dispatcher that the

robber was a black male *with a gun*. Moreover, when Ms. Boles initially refused to tell the police that everything was okay, she asked appellant why would she help them escape since he had just put a gun to her head and *he did not deny doing that*. In finding appellant guilty, the jury obviously found both Ligon and Ms. Boles to be credible, and in doing so, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial.

{¶90} For the reasons stated in this opinion, the assignments of error are overruled. It is the order and judgment of this court that the judgment of the Lake County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, J., concurs,

COLLEEN MARY O'TOOLE, J., concurs in judgment only.